Filed 3/27/14  Joel O. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| JOEL O. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G049398<br><br>(Super. Ct. Nos. DP023355,<br>                        DP023356,<br>                        DP023357)<br><br>O P I N I O N |


        Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Jacki C. Brown, Judge. Petition denied.

Frank Ospino, Public Defender, Dave Dziejowski, Assistant Public Defender, Charles J. Kozelka and Dennis M. Nolan, Deputy Public Defenders, for Petitioner Joel O.

Cara Bender for Petitioner C.O.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest, Orange County Social Services Agency.

Yana Kennedy for Minors.

\*          \*          \*

Joel O. (father) and C.O. (mother) seek extraordinary writ relief (Cal. Rules of Court, rules 8.450, 8.452) from the juvenile court's orders at the six-month review terminating reunification services concerning three children, C.O.'s daughters Ro. (born October 2005) and R. (May 2007), and the couple's daughter Z. (June 2011), and scheduling a Welfare and Institutions Code section 366.26 (all statutory references are to this code unless otherwise indicated) selection and implementation hearing for April 2, 2014. The parents challenge the sufficiency of the evidence to support the juvenile court's findings the parents failed to participate or show substantive progress in court-ordered treatment plans, returning the children to the parents would create a substantial risk of detriment to the children, and there was not a substantial probability of returning the children to the parents by the date of the 12-month review. Having reviewed the petition on the merits, we deny the requested relief.

I

FACTS AND PROCEDURAL BACKGROUND

According to mother and her 12-year-old son A. (born August 2000),[1] on November 15, 2012, father pushed mother against a wall and choked her, causing

---

[1] In March 2013, A. was placed in the home of his biological father, L.K., in Michigan. The juvenile court terminated dependent child proceedings as to A. in June 2013. Neither A. nor his father is a party to this writ proceeding.

swelling and redness around her neck. Father slapped A.'s face when he attempted to help his mother. Police officers arrested father and an emergency protective order issued.

According to mother, father, a Venezuelan national, had grown frustrated with his inability to obtain legal residency and employment, and father erupted in anger when mother quarreled with father over his failure to pay the rent. Mother conceded police had been to the residence "'a few times'" over the past year because of domestic disturbances.

Mother told the social worker father was not a violent or bad person, she would not obtain a restraining order, and would allow him back into the home after his release from jail. The social worker informed mother he would seek removal of the children if she allowed father to return home.

On December 11, father pleaded guilty to disturbing the peace. On December 13, officers arrested father for violating a court order barring him from contacting mother and the children. The Orange County Social Services Agency (SSA) took the children into protective custody.

Social workers noticed a bandage on Z.'s right forearm. Mother stated she left the children home without adult supervision while she shopped for cough medicine. She left a candle burning, and Z. sustained a second degree burn. Mother did not seek medical treatment for Z.

On December 17, SSA filed a petition alleging the children came within the juvenile court's jurisdiction under section 300, subdivision (b), because they had suffered, or there was a substantial risk they would suffer, serious physical harm or illness as a result of the parents' inability to supervise or protect them adequately, and to provide regular care due to the parents' mental illness or substance abuse. Specifically, the petition cited the November 15 incident, ongoing domestic violence since May 2012,

3

prior domestic violence between mother and M.S., the father of Ro. and R.,[2] substance abuse by mother and M.S., mother's and M.S.'s mental health issues, excessive physical discipline by father, and Z.'s burn injury.

In the initial report for the jurisdiction and disposition hearing, father denied choking mother and characterized the November 2012 incident as a verbal dispute, and asserted A., who took medication for attention deficit hyperactivity disorder, generally acted rudely towards mother. Although he did strike at A. during the incident, he "barely touched him." The parents and A. claimed A. lit the candle that burned Z. after mother left the children alone to buy cough medicine for the girls. Mother admitted snorting methamphetamine once, but denied current mental health issues. M.S., however, reported he and mother used methamphetamine on a daily basis during 2008 and 2009.

SSA placed the children in different homes with monitored visitation for the parents. In early January 2013, the social worker provided referrals for services including parenting programs, random drug testing, and substance abuse treatment.

Before the jurisdiction and disposition hearing, mother missed two drug tests, and tested positive for amphetamine on January 10, 2013. Mother attributed the positive result to the decongestant Sudafed, but the drug test provider explained there was "no possibility" the positive test resulted from taking this medication. Father also missed a drug test. The parents continued to have contact with each other in violation of no contact orders. Mother's visits with the children were sporadic, and father had not visited with Z. Mother provided incorrect contact information to the social worker and failed to submit proof she had enrolled in the programs listed in the case plan.

In early February, R. told her caregivers father had hit her on the head while she showered and she was afraid of him.

---

[2] M.S. did not comply with his responsibilities under the case plan. He has not filed a writ petition.

4

On February 13, 2013, the juvenile court found the amended allegations of the petition to be true. Mother and M.S. pleaded no contest to the allegations, and father submitted on the social worker's reports. The court removed the children from parental custody and ordered reunification services. The case plan required father to complete a parenting class and a 52-week certified domestic violence (batterer's) program. The visitation plan called for twice weekly supervised visits and authorized the social worker to liberalize or restrict visitation.

In early April 2013, father was in custody at Theo Lacy jail subject to an immigration hold. He had been arrested during a visit with Z. at SSA's visitation center for violating a probation condition requiring participation in the batterer's program. The social worker, Susan Genovese, mailed father two jail packs, including parenting workbooks, a toll-free number to call the social worker, and self-addressed stamped envelopes. Father was not permitted visitation while incarcerated on the immigration hold.

As of May 2013, mother had not complied with her case plan objectives. She had not "accepted the children's disclosures" about domestic violence or responsibility for the actions that brought the children into protective custody, stating it was "'all a big mistake.'" She had not visited Ro. and R. since February 22, and visits with Z. were sporadic. Mother continued her contact with father, missed several drug tests, and she failed to provide proof of enrollment in outpatient drug treatment, attendance at 12-step meetings, enrollment in empowerment or parenting courses, or psychological treatment. She also had not provided proof of a legal source of income, had not shown an interest in her children's current circumstances, had not kept SSA apprised of her current address and circumstances, and had missed appointments with the social worker.

5

Father also had not complied with his case plan objectives. He violated his criminal court probation, failed to enroll in a domestic violence program or parenting course, and visited Z. only twice.

By late June 2013, mother had made progress in some areas. She appeared more willing to accept the children's disclosures, presumably about father's excessive discipline. She consistently visited Ro., R., and Z., and maintained telephone contact with them. But she tested positive for methamphetamine again in May 2013. She still had not enrolled in a drug treatment program or supplied proof of attendance at 12-step meetings. The prior social worker, Susan Genovese, testified that during a meeting in late March 2013, mother displayed signs of drug use, including dilated pupils, agitation, scrambled thought, inability to focus, and sleepiness, which was a "presentation of somebody coming down from methamphetamines . . . ." Mother had maintained contact with father, feeling "legally 'obligated'" to help him with his immigration case. And she was unwilling to share her address with the social worker. She provided proof of enrollment in domestic violence and empowerment classes, although her continued association with father caused the social worker to question whether she could utilize the skills learned in those classes. The social worker felt mother would benefit from additional parenting classes and referred her to additional programs.

As of June, father remained in custody with an immigration hold. The social worker described father's compliance with service plan objectives and responsibilities as "not measurable" or "not in compliance." He had not returned the "jail packs," including parenting workbooks and other items the social worker sent him, nor did he maintain contact with her.

Mother had not been compliant with her case plan, which she now admitted she had signed only "'under duress.'" She had not enrolled in drug treatment or provided proof of attendance at 12-step meetings. She continued to be evasive about her whereabouts, declining to provide contact and other information to the social worker.

6

She "reverted back to stating that the children have not made statements regarding domestic violence and abuse within their home," and showed limited insight into her child's emotional needs. Mother again attributed a positive drug test, one in May 2013, to taking cold medication, although earlier she had blamed the result on her proximity to people smoking methamphetamine. Mother declined to enroll in additional empowerment and parenting classes, and refused to allow the social worker to speak with her prior course instructors. She falsely denied having contact with father, and she attended father's court hearings to request modification of the restraining order while missing visits with Z. She admitted she had not sought psychological treatment, as she previously indicated. She declined to provide income verification. Mother falsely claimed the older girls had nightmares after a visit with the maternal grandparents, and "was not in agreement with the grandparent visitation," but "was not able to articulate a valid reason" for her feelings.

After his release from custody in late June 2013, father consistently visited Z. twice a week. But he denied responsibility for the children's removal, denied any domestic violence, and claimed A. lied about father assaulting mother. Father denied being on probation, evidence to the contrary notwithstanding, and refused to provide contact information for a probation officer. He also refused to release information concerning his domestic violence program. During a meeting with the social worker, father became highly agitated, raised his voice, and assumed a threatening posture until the social worker pointed out a camera in the interview room. Father remained unemployed, and declined to provide information concerning his current living arrangements. He had not enrolled in an approved parenting class. Witnesses reported father and mother continued to have regular contact. Father stated he wanted Z. to be placed with his family in Venezuela, even though he had requested asylum from the United States after fleeing that country.

The social worker concluded it was not substantially probable the court would return the children to the parents by the 12-month review. The "current risk level" remained "very high." The parents refused to participate in most court-ordered programs and "rarely or never demonstrate[d] desired behavior." The social worker cited mother's ongoing drug abuse, chronic discord and domestic violence within the home, a limited support system, lack of insight into the children's developing needs, refusal to accept treatment, and insufficient resources. The worker described visits with the children as "limited in quality" and "[un]acceptable," because the parents did not respond appropriately to their children's emotional needs.

In early August mother claimed she had attended counseling through Interval House and a domestic violence support group since January 2013. She also claimed she had reenrolled in a parenting class and "completed an intake" at a drug treatment program in late July. She gave the social worker cards showing she had been going to Al-Anon, rather than 12-step meetings as the case plan required, and falsely claimed the previous social worker approved this. In late August, mother advised the social worker she had moved 250 miles away from Orange County where she found employment, but again would not provide verification. She listed different addresses to the social worker and the court and could not explain the discrepancy.

SSA placed Ro. and R. in Z.'s foster home in early September 2013. The court authorized the older girls' maternal grandparents, who lived in Missouri, to visit the girls on specified occasions. A counselor at Interval House stated mother had enrolled in a 12-week parenting education class in January 2013, and joined a support group in February. She attended some sessions but did not complete the program, nor did she attend an empowerment program through Interval. Mother also missed drug testing appointments, did not verify participating in a drug treatment program, and did not provide evidence she attended 12-step meetings. Mother continued to deny she had a drug problem. She claimed to be working and living 250 miles away, but records showed

8

she attended a parenting class at Interval on a work day.  Mother "had no excuse," and the social worker described mother as having "minimal credibility."

The social worker learned mother listed father as living in her home when she sought a restraining order against A.'s former caretaker.   Mother also missed another drug testing appointment, despite the social worker's numerous warnings that a missed test was considered the same as a positive test for drugs.

Father stated he remained unemployed and continued to reside with a friend who supported him financially.  He continued to attend domestic violence classes and had started another parenting class.  He learned he "has options and he can remove himself from a situation by leaving."  He continued to deny any physical violence, but he admitted he had contributed to verbal arguments and should have walked away.  Father wrote letters to the older girls apologizing for the "situation."  He stated he was learning to accept responsibility.  He still wanted Z. to live in Venezuela with his family rather than have her adopted in the United States.  Father's counselor informed the social worker father tested positive for amphetamine on October 2.  Father stated he "'never used and it was probably some medication he took that the jail gave him.'"  The counselor believed father's effort was good in his batterer's program and appeared motivated to learn.

In mid-October, mother's drug counselor informed the social worker mother denied a history of substance abuse and did not know why she had to attend the program.  The counselor complained mother would not answer direct questions, and compared her conversations with mother to "a 'smoke and mirrors game.'"  A mental health evaluation report indicated mother did not qualify for mental health services through the county.  Mother missed a drug test on October 12, 2013, and tested positive for methamphetamines on October 29.

In late October, the foster parent advised the social worker Ro. disclosed that during a fight, father gave a knife to mother and told her to use it to kill herself or

9

him. Ro. said father hit Ro. and A. a lot, and one time he left a mark on her "butt." On another occasion he tried to use a bat, but mother stopped him. R. also disclosed to the foster parent a different version of how Z.'s burn occurred. Ro. and A. were cooking and Z. reached toward the stove and hit her arm on the cooking pan. Father got mad at A. and hit him with the pan. Ro. stated mother made "her and A[.] cook because she could not always get out of bed." After a visit between father and Z. on October 9, the foster parents saw mother and father together in mother's car.

The oft-continued six-month review hearing began November 13, 2013. The juvenile court admitted the social workers' reports into evidence, and the social workers and parents testified.

Mother testified concerning the November 15, 2012 domestic violence. She claimed father pushed her during a verbal argument and the children did not witness the incident. She terminated her relationship with father after his arrest, although she desired to "get along as parents" to "show that example to our daughter. I don't go beyond that at this point." Mother explained she attended immigration hearings for father because she was his legal representative and was afraid "sanctions [] would be placed on" her if she was not present. She denied having a current relationship with father and claimed she saw him only in juvenile court proceedings. She alleged witnesses who claimed they saw her with father in October 2013 mistook him for another man. Mother admitted listing father as a member of her household when she applied for a restraining order against A.'s former caretakers in August 2013, but said a clerk advised her the order applied to family members who did not live together, and she needed father's name on the application to present evidence involving harassing phone calls made to father. Mother discounted Ro.'s reports of other domestic violence incidents, attributing Ro.'s disclosures to the trauma of being removed from the home and social workers prodding Ro. to "say something that [Ro.] doesn't feel is true."

10

Mother denied using methamphetamine, stating she had tried it only once for "shock value" during an argument with M.S. in 2008. She denied using the drug with M.S. every day, as he claimed. She blamed the positive drug test in May 2013 on over-the-counter cold medicines and a medication she took for migraines. Mother agreed she appeared tired during the meeting with social worker Genovese, but denied using methamphetamine or other illegal substances before the meeting. She recalled missing a drug test in March 2013, and other tests after she relocated to Blythe to seek employment. Addressing the positive test for methamphetamine on October 29, 2013, mother suggested the counselor at the Mariposa outpatient drug program confused her test results with someone else because "there are three or four of them [test results] on the table, and she wasn't sure which one was mine." Asked why she waited until October 2013 to begin outpatient drug treatment, she stated "it wasn't appropriate." Mother claimed she was now attending 12-step meetings.

Mother denied concealing her residence in Blythe, and explained she would move to Blythe as "part of establishing a new home for us when they would be able to return." Mother missed several visits with her daughters in September, explaining "[t]hey were not arranged to work with my new work schedule." But recent visits had gone well, and the girls expressed their love for her. Mother described a safety plan and said she would be "their guard dog" and would demonstrate to them she was "in their corner" and would make "sure that outside forces aren't hurting them and that I'm not hurting them too." If the court returned the girls, mother thought counseling for her and the girls would be required. She thought Ro.'s problems stemmed from domestic violence occurring during mother's brief relationship with M.S., who was violent, manipulative, unbalanced, and prone to rage.

Mother testified she was participating in a domestic violence support group and weekly parenting classes, and would complete the parenting course after attending three more sessions. She disagreed with the social workers she had not learned anything

11

from these programs. She accepted responsibility for the children's removal and admitted she placed them at risk. But she was unconcerned if father was around the children because "he was a very caring and attentive person in their lives . . . ." She denied father "was abusive in any way to any of [the] children," explaining he had been a stay-at-home father who attended to all the children's needs while mother worked. Mother complained she had a communication problem with the social workers, who focused primarily on father's immigration issues and mother's failure to provide them with paperwork.

Father testified the police had been to his home twice before his arrest in November 2012 because he was "being violent, yelling at" mother, but he denied using physical violence on these occasions. During the November incident, he admitted pushing, grabbing, and holding mother in an argument over the rent. He first stated he did not know if he left marks on mother. Father yelled at A. when he came to his mother's aid, and now regretted the way he handled the incident. Father spanked the children to discipline them, and admitted he might have gone too far, "using too much strength." He now understood how to handle a situation because he had "been going to different classes." He violated the restraining order imposed after the November incident because he returned back to the house to "make a phone call" and did not fully comprehend the scope of the restraining order.

Father initially did not enroll in the batterer's program because he did not have the money, and he was waiting for a tax refund. He received a 10-day sentence for the probation violation, and then immigration authorities placed a hold on him. He remained in immigration custody at Theo Lacy jail for three months until June 21 after he obtained a sponsor. Contradicting the social worker, he stated he was allowed visitors, but only his foster brother Yves Pierre visited. He did not know how to make phone calls from the jail, so he never called his attorney or the social worker. He did not ask Pierre

12

to contact the social worker for him. He received mail from Pierre in jail but he did not receive the social worker's packets.

Father signed up for the batterer's program and parenting classes the Monday after he was released from custody. Father had attended 22, two-hour sessions of the 52-week batterer's program by the time of the six-month review, and had not missed any sessions. He learned about "the box" or the "thing that make[s] you lose your control" and "when you're feeling that you're getting out of the box is when you need to do the walk away and then come back an hour later . . . to solve the problem." He had learned about taking responsibility and not making excuses. He admitted his domestic violence had created "big trauma" for Z. and the other children because they missed their mother.

The 12-week parenting class he completed taught him how to interact with and discipline the children. He learned about "rules and consequences" and "fair parenting" and that physical discipline is "not okay." Father denied using any physical discipline on Z., but had used it on the other children. A. had been difficult for him because A. had attention deficit hyperactivity disorder. He later enrolled in the "same [parenting] program but in another place."

Father admitted that in a July meeting with the social worker he accused A. of lying about the November 2012 incident. Father agreed he was "not accepting responsibility" when he accused A. of lying, and admitted A.'s description of the incident was "accurate." But he denied the children's reports that he straddled mother with his hands around her throat and insisted the "children didn't see anything." He admitted on cross-examination he gave mother a kitchen knife during the November 12 incident and asked her to kill him because he was frustrated. He denied trying to hit Ro. with a bat, as the girl disclosed, and did not recall leaving marks on her bottom when he spanked her. He disagreed with the social workers' opinion he had not made positive changes and he complained the current social worker only had seen him twice.

13

He admitted lying to the social worked in an October conversation when he denied using any physical violence against mother. It was a "bad decision that I made by not telling her the whole story." He had been "worried about what [the social worker was] going to think about" him and felt they would "use it against" him.

Father visited Z. twice a week at SSA's offices. She called him "da-da." He missed two visits because of illness, and twice he forgot to confirm visits. He blamed himself and felt bad for Z. because he was "the one that's supposed to be there with her and making sure that everything is okay for her."

Father denied ever taking illegal drugs, but could not explain his positive drug test for amphetamines at the batterer's program in October. He had taken the blood pressure medication he received from jail and had something to drink. The batterer's program did not treat father's positive result as a violation and did not ask to see the medication bottle. He was not currently drug testing although the batterer's program could select him for a random test. He did not know mother had a positive test for methamphetamine in late October, but it did not concern him because "it's about her" and he needed "to care about me and my daughter." Father did not have concerns about mother being around Z. or having unmonitored visits with her and felt Z. would be safe. He did not think "it's safe for somebody under the influence of drugs to" take care of Z., but did not "see any things like that" when he was with mother.

Father denied having any contact with mother since the February 2013 disposition hearing other than at juvenile court and at SSA's visitation center. A criminal court restraining order barred him from other than "peaceful contact" with mother. He lived in Torrance with friends and did not know where mother lived. He did not want to resume his relationship with mother "because I don't feel okay going back to her." He did not know mother had put his name on the restraining order application, and explained he still wore what appeared to be a wedding ring because it "means my daughter, if you don't know" or "together with Z."

14

Following the review hearing, the court found by a preponderance of the evidence return of the children to the parents would create a substantial risk of detriment to their safety or well-being. The court found the parents failed to participate regularly and make substantive progress in court-ordered treatment programs and that SSA offered the parents reasonable reunification services. The court also found there was no reasonable likelihood that additional services would create a substantial probability the children could be returned by the 12-month review date two months later. The court terminated reunification services and set a section 366.26 hearing for April 2, 2014.

II

DISCUSSION

A.    *Substantial Evidence Supports the Juvenile Court's Finding that Returning the Children to the Parents Posed a Substantial Risk of Detriment to Their Physical or Emotional Well-Being*

The parents challenge the sufficiency of the evidence to support the juvenile court's finding of detriment. At the six-month review, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations . . . ; and shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself to services provided, taking into account the particular barriers to an incarcerated, institutionalized, detained, or deported parent's or legal guardian's access to those court-mandated services and ability to maintain contact with his or her child." (§ 366.21, subd. (e); *In re Jasmon*

15

*O*. (1994) 8 Cal.4th 398, 420 (*Jasmon O.*) [at each review during reunification, it is presumed the child will be returned to parental care].) We review the record to determine whether substantial evidence supports the juvenile court's detriment finding. Evidence that is reasonable, credible, and of solid value satisfies the substantial evidence standard. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1401.) In our review, we view the evidence in the light most favorable to the judgment, mindful that it is not our function to reweigh the evidence or express our independent judgment on the issues confronted by the juvenile court. (*Jasmon O., supra*, at p. 423.)

1.   Father

Father emphasizes he followed the reunification plan after his custodial release in June 2013 by completing a parenting class, and enrolling in another. He maintained perfect attendance in his batterer's treatment class, received high marks, and had completed nearly half of the program by the time of the hearing. He cites his testimony acknowledging his physical discipline of the children was inappropriate and now understands how domestic violence traumatized his children and undermined their development. He correctly notes perfection in performing a service plan is not required (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343), and claims his acceptance of responsibility for the domestic violence evolved from complete denial to full acknowledgment of his role in the violence that led to the children's removal.

The issue, however, is not whether the juvenile court could have reached a different result, but whether substantial evidence supports the court's finding. Here it certainly did. The record reflects during the bulk of the review period father repeatedly denied a role in creating a violent household. He accused the children of fabricating or exaggerating and never adequately explained why the older girls feared him or accused him of violence against them. As late as August 2013, father argued "this is all a big mistake" and denied doing anything to cause his child to become a dependent. Father violated the restraining order issued in his domestic violence case, and violated his

16

probation by initially failing to participate in a batterer's treatment program, which resulted in his incarceration until June 2013. He refused to provide information so the social worker could contact the probation department or his domestic violence program and declined to provide information concerning his living arrangements. He missed drug tests and he continued to have surreptitious contact with mother in violation of no contact orders.

Although father had completed a parenting class, the social worker described father's visits with Z. as "limited in quality" and "[un]acceptable." Because of his lack of insight into Z.'s emotional needs, father had difficulty expressing empathy and guidance for his child. The social worker testified at the six-month review father's visits remained monitored because "[h]e continues to demonstrate in the visit that he doesn't entirely know how to handle Z." He "doesn't [know] how to handle in bringing her back and re-engaging her to listen to him. . . . [H]e expects her to know how to do certain things that just for her age she just wouldn't know." Rather than "being compassionate and saying 'come on' in a softer tone" to get her to come back to him during visits he employed "a harsher tone." He told a visitation monitor "you need to get her to listen to me." The social worker had spoken to father about this issue, but he had not made improvement. Father compromised his progress further by selecting a non-SSA contract provider for parenting classes, and the instructor refused to disclose information to the social worker even when presented with father's signed waiver.

In October, father tested positive for amphetamines. Father denied using the drug, stating "'it was probably some medication he took that the jail gave him.'" But the social worker believed father had a substance abuse problem based on the positive test because he "chose to use [drugs rather] than arrive to the class sober."

Father emphasizes the excellent September progress report he received from the batterer's program facilitator. But the social worker testified the batterer's program did not get "a history or knowledge of the specifics of [father's] case" and just

17

heard "what [father] reports in [] class." The social worker remained concerned father continued to deny that physical abuse occurred in the home, and continued to minimize his actions as merely arguing or yelling, even though the court had found the physical abuse allegations true, and the children continued to disclose that physical violence occurred in the home, including Ro.'s disclosure that father hit her often. As part of a homework assignment in the batterer's class, he drafted apology letters to R. and Ro., but euphemistically referred to the abuse during an October 9 meeting with the social worker as "'the situation,'" again denying any physical violence. The juvenile court reasonably could conclude the evidence showed the father lacked the motivation or ability to grasp fully how his violence harmed his children.

True, father accepted some responsibility at the hearing for physically abusive conduct towards mother and the children, but he also continued to minimize his behavior. Evidence contradicted the parents' testimony denying contact with each other, and as the juvenile court remarked neither parent maintained "honest and regular and consistent contact with the social worker." The court was not required to accept father's dubious explanation for his positive drug test, and father's lack of insight into Z.'s emotional needs required using a monitor throughout the review period. To the extent father demonstrated growth, any marginal improvement came late in the period under review and did not by itself demonstrate he had made substantial progress in meeting the objectives of the case plan. Ample evidence supports the juvenile court's finding father did not participate regularly and make substantive progress in court-ordered treatment programs, and thus return of Z. to father's physical custody in December 2013 would create a substantial risk of detriment to her physical or emotional well-being.

2.    Mother

The social worker testified in her opinion the children could not be returned home to mother because she failed to accept responsibility for the events that led SSA to

18

remove the children, and lacked insight into her children's needs despite obtaining completion certificates from a 10-week empowerment program in April 2013 and an 8-hour parenting program in early June 2013. Mother belatedly participated in an outpatient substance abuse program (Mariposa), but denied having a drug problem, even though she had several positive and missed tests during the review period. She tested positive for methamphetamine shortly before the six-month review, on October 29, 2013. Program counselors reported mother denied a drug problem and she questioned her need for substance abuse treatment. Mother claimed she previously participated in this drug program in July 2013, but the program reported mother had not attended after she enrolled. Mother did not provide proof she attended 12-step meetings. She provided proof she went to two Al-Anon meetings, but the social worker told her Al-Anon meetings did not qualify because it focused on helping family members of substance abusers. Mother claimed the prior social worker, Susan Genovese, approved her participation in Al-Anon, but Genovese testified she never told mother she could attend Al-Anon meetings rather than 12-step meetings. Mother claimed at the six month review she was attending 12-step meetings, but forgot her attendance cards. As noted above, mother attributed positive tests to taking cold medicine or inhaling second-hand smoke from other methamphetamine users.

The evidence recounted above supports the finding mother did not participate regularly or make substantive progress in court-ordered treatment programs. As the prior social worker testified, despite empowerment classes, mother did not "gain[] anything from them to move her in a positive direction from the situation that she was in with [father] that caused the case to be open . . . knowing they still had contact with each other." Mother did not agree with the domestic violence or substance abuse findings despite substantial evidence to support them. Her participation in case plan services and visitation appeared perfunctory. She made false or at least disingenuous statements about drug use and participation in case activities. As the prior worker testified, by "her

19

behavior and her non-compliance, [mother] was not putting her children first." Mother's continuing denials, late into the reunification period, concerning domestic violence, substance abuse, and contact with father strained credulity. Her failure to participate fully in her case plan and modify her outlook and behavior demonstrate that placing the children with her posed a substantial risk of detriment to their welfare.

This case bears no resemblance to *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738. There, the father was *falsely* accused of sexually abusing a child, but the social worker and juvenile court used the parents' steadfast denials of abuse as evidence it would be detrimental to return the child to their custody. (*Id.* at p. 1752.) Here, the evidence belies mother's denials she had a drug problem or that there was domestic violence in her relationship with father. This is not a "'confession dilemma'" case where an innocent parent is required to admit untrue allegations to reunify. The evidence amply supports, indeed mother did not contest, the juvenile court's jurisdictional findings. The question is whether mother sufficiently mastered the lessons learned from services offered by SSA to escape the cycle of abuse with father. In sum, substantial evidence supports the juvenile court's finding return of the children to the parents in December 2013 would create a substantial risk of detriment to their physical or emotional well-being.

B. *Substantial Evidence Supports the Juvenile Court's Finding the Parents Failed to Participate Regularly and Make Substantive Progress in the Court-Ordered Treatment Plan*

Father argues substantial evidence does not support the determination that he failed to regularly participate and make substantive progress in court-ordered treatment, and thus the court erred in scheduling the section 366.26 hearing because his "acceptance of responsibility for the domestic violence evolved from complete denial to full acknowledgment of his role in causing the children's removal by virtue of perpetuating violence in the home." This is a variant of the argument rejected above. As

recounted, there was substantial evidence to support the juvenile court's finding father did not regularly participate and make substantive progress in court-ordered treatment, and the court did not err in scheduling the section 366.26 hearing for this reason.

Mother contends the juvenile court applied the wrong standard of proof in concluding she failed to regularly participate and make substantive progress in court-ordered treatment. Most findings at the six-month review are made under the preponderance of the evidence standard, but the juvenile court may schedule a section 366.26 hearing only if it has found by *clear and convincing* evidence the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan. (§ 366.21, subd. (e).)

Mother contends the juvenile court failed to apply this heightened standard of proof when it concluded the parents' failed to participate regularly and make substantive progress in a court-ordered treatment plan. Mother also notes the court's minute order does not reflect the standard of proof the court applied in making its findings. We do not find this contention persuasive. When father's counsel stated he did not believe SSA had proved by clear and convincing evidence that father failed to regularly participate and make substantive progress in the court-ordered treatment plan, the court responded, "I do believe I have found that by clear and convincing evidence, that reasonable services have been offered but that the father has failed to make substantive progress within the six months." Thus, the record demonstrates the juvenile court applied the correct standard of proof in evaluating father's case. Consequently, we must assume the court performed its duty and applied the identical clear and convincing standard in assessing mother's participation and progress under the court-ordered treatment plan. (Evid. Code, §664 [presumption that official duty has been performed].)

21

C.     *Substantial Evidence Supports the Juvenile Court's Finding it Was Not Substantially Probable the Court Would Return the Children by the 12-Month Review*

Section 366.21, subdivision (e), provides in relevant part: "If . . . the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (§ 366.21, subd. (e).)

Section 361.5 authorized no more than 12 months of reunification services for the sibling group because Z. was under age three at the time of her removal.  The juvenile court therefore had to determine whether it would return the children by February 2014.  (See §§ 361.49, 361.5, subd. (1)(B), (C).)

In making this determination, the court was required to consider whether the parents had consistently and regularly contacted and visited the children, whether they had made significant progress in resolving the problems that led to the removal of the children, and whether the parents had demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional health and special needs.  (Cal. Rules of Court, rule 5.710(c)(1)(D)(i).)

1.     Father

Father admits he initially did not visit Z. regularly, but notes after his release from incarceration he missed only a handful (five or six between August and November 13 according to the social worker) of visits with Z., and the quality of his visits with Z. improved considerably.   He also repeats his assertion he had progressed from complete denial of responsibility for domestic violence to nearly complete acceptance.  He cites his perfect attendance in batterer's treatment and positive

22

performance evaluations and claims he had established his ability and capacity to complete the service plan so that Z. could be returned safely to his custody.

While father's regular visitation and participation in the domestic violence program might have been enough to authorize an extension of the reunification period,[3] the evidence did not require the court to extend the period. As noted above, even as late as the November hearing, father continued to minimize his responsibility for domestic violence. The parents' testimony contradicted other evidence in the case in several particulars, including whether they surreptitiously continued contact with each other. Father's explanation for his positive drug test was not believable, and his description of his visits with Z. were contradicted by the visitation reports, which showed why he had not progressed beyond unmonitored visits. The evidence recounted above supports the juvenile court's finding there was not a substantial probability Z. might be returned to father by the 12-month review in February 2014.

2.    Mother

Mother contends there was a substantial probability the court would return the children to her care with additional services, arguing her successful completion of an empowerment program and parenting class demonstrated her progress, but she needed additional time to complete her drug program, which was only sixteen weeks long. She emphasized her bond with the children and her regular visitation, arguing the court erred in not giving her the additional time to complete the substantial progress she made on her service plan.

---

[3]    Father cites minor's counsel's closing argument that father's "recent progress in the 22 sessions of his [domestic violence] program" was "enough to extend his services," but this was a "call for the court." In this writ proceeding, minor joins in SSA's argument "that the parents failed to show substantive progress to support going to the twelve-month review, which at the time of the [six-month review in December 2013] was only a few short months away."

Substantial evidence supports the juvenile court's decision. The social worker testified mother maintained an ongoing relationship with father even though he had not accepted responsibility for the actions that brought the children before the court. According to the social worker, Mother had not shown "in any way, shape or form that she'd be able to protect her children . . . from being at risk . . . in her care." Mother also had a substance abuse problem with methamphetamine. She attended a program but her "prognosis for that is poor" because she continued to deny she had a problem, offering implausible explanations for her positive drug tests.

Mother's fairly consistent visitation and the apparent affection existing between her and the girls did not require the court to extend the reunification period. The parents' testimony contradicted other evidence in the case in several particulars, including whether they surreptitiously continued a relationship with each other. Mother's failure, despite parenting and empowerment programs, to recognize the harm posed to her children by a violent household, and her inability to acknowledge, let alone overcome, substance abuse issues constituted substantial evidence to support the juvenile court's finding there was not a substantial probability the girls might be returned to mother with a few more months of reunification services.

## II

### DISPOSITION

J.O.'s and C.O.'s petitions seeking extraordinary relief from the juvenile court's December 9, 2013 orders terminating reunification services and setting a section 366.26 selection and implementation hearing for April 2, 2014 are denied, as are the requests for a stay of the section 366.26 hearing.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.